Filed 2/23/22  In re J.O. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re J.O., a Person Coming Under the Juvenile Court Law. | |
| KERN COUNTY DEPARTMENT OF HUMAN SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>A.O.,<br><br>Defendant and Appellant. | F083028<br><br>(Kern Super. Ct. No. JD142056-00)<br><br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING**<br>[NO CHANGE IN JUDGMENT] |

It is ordered that the opinion filed herein on January 31, 2022, be modified in the following particulars:

1.  On page 15, in part II.A., the last sentence in the first paragraph under the heading "*Legal Principles*," which reads:  "The jurisdictional findings are prima facie evidence that the child cannot safely remain in the home.  (*Ibid*.)" is deleted.

There is no change in the judgment.  Appellant's petition for rehearing is denied.

POOCHIGIAN, Acting P. J.

WE CONCUR:

DETJEN, J.

SNAUFFER, J.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re J.O., a Person Coming Under the Juvenile Court Law. | |
| KERN COUNTY DEPARTMENT OF HUMAN SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>A.O.,<br><br>Defendant and Appellant. | F083028<br><br>(Kern Super. Ct. No. JD142056-00)<br><br>**OPINION** |

APPEAL from orders of the Superior Court of Kern County.  Marcos R. Camacho, Judge.

Sean Angele Burleigh, under appointment by the Court of Appeal, for Defendant and Appellant.

Margo A. Raison, County Counsel, and Jennifer E. Feige, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

Appellant A.O. (Father) is the father of the four-year-old child Juliet O. (the child), who is the subject of a dependency case. Father challenges the juvenile court's orders issued at a contested jurisdiction and disposition hearing that resulted in the removal of the child from Father's custody. Father contends the juvenile court's jurisdictional and dispositional findings are not supported by substantial evidence. He also asserts that the juvenile court abused its discretion when it required him to submit to drug testing and potential substance abuse counseling. We affirm.

## FACTS

### *Initial Removal*

On May 11, 2021, the Kern County Department of Human Services (Department) received a suspected child abuse report that the child's mother (Mother) allowed a man to take the child to a store, but the man had not returned two hours later. Law enforcement eventually located the child eating with the man outside of a market.

Upon contact by the Department on May 14, 2021, Father acknowledged that he allowed the child to have an unsupervised visit with Mother despite being told that Mother was not to be left alone with the child. The child had been left in Father's care as part of a plan to avoid juvenile court intervention after an investigation in January of 2021 regarding Mother's substance abuse.

Father informed the investigating social worker that he went to file for full custody of the child on the date that the suspected child abuse report was made, but he could not explain why he failed to establish custody after the previous investigation by the Department. He allowed the child to visit with Mother because the child wanted to see her. While Mother looked sober when he dropped the child off for the visit, he reported that she " 'didn't look too good' " when he picked up the child. Father was residing with his aunt, and he was unaware of where Mother was living. He admitted to giving Mother the benefit of the doubt too many times, and he had not allowed contact between Mother and the child for the past three days.

2.

The investigating social worker communicated with Mother later that same day by phone. Mother claimed that her cousin took the child to get a bag of chips, but law enforcement was contacted when they were unable to reach him by phone after 40 minutes. Mother had Father pick up the child once she was located by law enforcement. Her visits with the child were said to be weekly with Father present, however, he left to do something during the most recent visit. She asserted Father did not like the person who took the child to the market during the visit, but he was aware that the person was present during the visit.

Mother admitted to drug use four months prior, and she was planning on going to an inpatient program. An informal custody agreement was reached where she had weekly visits, and she planned to have the child live with her once she reunified with her oldest daughter. She acknowledged using drugs while caring for the child and her dependent sibling. It was later discovered that Mother had a positive drug test on April 14, 2021, and missed a drug test scheduled for May 11, 2021. Mother had mentioned her plan to go to an inpatient treatment program to another Department social worker on several occasions, but she had yet to make any definitive efforts to attend one.

On May 17, 2021, the investigating social worker met with Father and the child at their home. Father denied seeing the person who left with the child when he dropped the child off, and he claimed to not recognize the man when he picked up the child from the market around 10:30 p.m. The child was unable to provide a meaningful statement about the incident, but she did state that she knew Mother's friend. Father understood that Mother relapsed, but he would not provide the social worker with the date that she informed him of the relapse. He admitted that he and Mother both used methamphetamine in the past, but claimed they stopped when she became pregnant.

Father stated that he was asking for full custody of the child with supervised visits for the Mother in his court filing. He agreed to voluntarily drug test and confirmed that he would continue to live with his aunt. The aunt's home had been previously inspected

by the Kern County Sheriff's Department and found to be clean and safe for the child. The Department obtained a protective custody warrant and served the warrant at Father's home on May 19, 2021. Father was informed about the child going to a temporary foster home, and the child was placed into protective custody.

On May 19, 2021, the Department filed an original petition alleging the child was described by Welfare and Institutions Code section 300, subdivision (b)(1).[1] The petition alleged that Father failed to adequately protect the child by allowing her to participate in an unsupervised visit with Mother despite his awareness of her substance abuse problem. The Department also filed a detention report, which set forth the above events surrounding removal and previous child welfare referral history for both parents.

**February 2019 Referral**

On February 7, 2019, the Department received a referral alleging general neglect and emotional abuse of an unrelated child living in the home under a guardianship. The unrelated child had driven Father's vehicle and was taken to the emergency room for nicotine side effects. Mother began having suicidal ideation and disclosed domestic violence between her and Father. She claimed the last incident of domestic violence was two days ago, and the children witnessed the domestic violence. Father was upset when he appeared at the hospital, and he had to be escorted out of the hospital. Mother went to seek shelter and assistance from a domestic violence program and did not plan on returning home. Mother tested positive for amphetamines, but she denied any drug use. The referral was closed as unfounded after an investigating social worker was told the domestic violence was no longer physical and Mother was aware of domestic violence resources.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

**May and July 2020 Referrals**

The Department received a referral on May 27, 2020, alleging Mother was using methadone and heroin, however it was evaluated out because it did not " 'meet in-person criteria.' " Another referral was received on July 23, 2020, claiming Mother threw a party at her home, which left unsanitary and hazardous conditions throughout the home. It was believed that individuals using drugs were going in and out of the garage. The child, at two years of age, was seen playing in a children's pool with one foot of water without supervision throughout the day. The allegation for general neglect was unfounded without further explanation or a documented investigation.

**October 2020 Referrals**

The Department received another referral on October 20, 2020, which alleged hazardous and unsanitary conditions in the home. The child was found walking barefoot in glass and law enforcement had responded to the home twice that week to check on the children's welfare. It was determined that the child would live with Father on a temporary basis as the allegation of general neglect was substantiated. Mother admitted to recent methamphetamine use and tested positive for morphine, but the investigating social worker did not believe it hampered her ability to care for the child and her siblings.

A separate referral was received on October 26, 2020, alleging Mother hit the child's older sibling in the face, and drugs were accessible to the other children who remained in the home. Mother admitted to using methamphetamine twice in the last six months with her last use on or about October 24, 2020. She was participating in a "Methadone Program" due to an addiction to pain medication, and she tested positive for morphine on November 5, 2020. Mother claimed she "accidentally" hit the child's sibling during an argument, and the Department did not substantiate the referral for general neglect, physical or emotional abuse. Mother agreed to participate in early intervention services through "Differential Response," with a focus on maintaining a clean home. (See § 10609.9, subd. (a)(1).)

5.

**December 2020 Referrals**

On December 21, 2020, the Department received a referral stating Mother briefly went to rehab, but she was currently using methamphetamine and fentanyl. The reporting party alleged Mother was crushing fentanyl and smoking it. The child was said to be with Mother "some of the time" and Father a majority of the time. The referral was evaluated out because Mother could not be located.

Another referral was received on December 23, 2020, alleging a minor found Mother burning a pill on tin foil in the home. An allegation of general neglect was substantiated as to the child's older sibling, K.S. The child was present at Mother's home during the December 23, 2020 contact, as noted by the investigating social worker. Mother did not make herself available for in person contact, but she allowed K.S. to be interviewed. K.S. found a methamphetamine pipe in the home, and she located the child near burnt foils. She also observed Mother staying up all night, acting paranoid, having wide eyes, and moving her feet rapidly. One of the children in Mother's custody under a guardianship reported Mother overdosed, and she and her sibling were staying with others for the last few months.

Mother admitted to using Xanax and methamphetamine on December 4, 2020, and fentanyl one month prior. However, it appeared Mother was still minimizing her actual drug use. Father contacted the social worker investigating the December 23, 2020 referral to ask if he could let the child stay with the Mother. The social worker advised against it, and she reiterated the reports that Mother was using drugs and leaving drugs in places accessible by the child. He claimed Mother was clean and that she had not used in "awhile." Father indicated he would at least allow Mother to have a supervised visit against the recommendation of the social worker.

On January 4, 2021, Father confirmed that the child was in his care, and he explained that the visit did not go well with Mother because he would not allow her to take the child unsupervised. The social worker explained that Father should not allow the

child to be with Mother without supervision as it could constitute a failure to protect due to the Department's concerns with Mother's ability to provide care for the child. Father acknowledged his need to work with the Differential Response case manager to obtain custody orders with supervised visits for Mother.

On January 7, 2021, the Department received communication from a sheriff's deputy that Mother was found suicidal, resisted law enforcement, and was placed under a section 5150 hold on December 20, 2020. Mother had fired a handgun in an attempt to kill herself, and she was going to cut her leg open and kill her dog. She attempted to flee the responding law enforcement officers before she was Tased and handcuffed.

The deputy also indicated that Mother was tied up and beaten on January 6, 2020, which was believed to be related to a drug transaction. Mother appeared to be under the influence, and she was transported to the hospital for treatment of her injuries. The allegations of general neglect as to the child's sibling, K.S., were substantiated, and K.S. was removed from Mother's care through the filing of a dependency petition and protective custody warrant. The allegations of general neglect as to the child were inconclusive because it was unclear whether the child was exposed to Mother's drug use. However, it was stated that Father should not have allowed the child to be in her care without supervision. The child was ultimately left in Father's care with the understanding that Father would work to obtain custody orders with supervised visits for Mother.

At a detention hearing held May 24, 2021, the juvenile court ordered that the child be detained from Mother and Father's custody, supervised visitation be arranged weekly for both parents, and a jurisdiction and disposition hearing be set for June 15, 2021.

*Jurisdiction and Disposition*

On June 15, 2021, the Department filed a jurisdiction report along with a separate disposition report. The jurisdiction report recommended that the allegations in the original petition be found true. The report detailed a conversation between Father and a

7.

Department social worker where he took full responsibility for leaving the child with Mother. He claimed he would never put the child in harm's way again. He also acknowledged that he was previously warned by the Department to not allow Mother to have unsupervised access to the child. The unsupervised visit was allowed by Father because she was crying for her Mother, and he did not want to keep the child from her Mother.

A police report from the Kern County Sheriff's Department from the date of Mother's unsupervised visit was attached to the report. The report indicates that the person who took the child to the market was "a good friend" of Mother's, which contradicted Mother's previous reporting that it was her cousin. Mother told the officer that she allowed her friend to take the child to a store for a snack, but she began to panic when he had not returned after two hours. Mother provided conflicting information about whether she was living at the residence that the officers responded to.

The officers discovered the child may be at a local market, and they located her with Mother's friend at the market. Mother's friend told the officers that he was dating Mother, and he took the child to eat with Mother's permission. Her friend had stopped at multiple places prior to the market, and he was paying for the food items when the officer located him and the child. Father responded to the market and took the child back to his home. Father told law enforcement that he left the child with Mother for a few days for a visit. The officers explained that Mother was not a suitable parent, and they advised him to obtain full custody through court.

The disposition report recommended that the child remain in foster care with reunification services provided to both parents. Parenting and neglect counseling and random monthly drug and alcohol testing were recommended services for Father's case plan. The report indicated that Mother suffered from depression, anxiety, obsessive compulsive disorder (OCD), posttraumatic stress disorder (PTSD), and she was diagnosed with borderline personality disorder. Mother took multiple psychotropic

8.

medications. Mother disclosed past use of heroin, Xanax, methamphetamine, fentanyl, and ecstasy. She admitted that she used to "shoot meth" six times per day before she stopped using.

Father had one other child who lived with her biological mother. Father was residing with his cousin and indicated he would move out if it allowed him to have custody of the child. The child participated in a supervised visit with Father in person on June 1, 2021. The visit went well with Mother participating through a video call on Father's phone.

**Father's Testimony**

At the contested jurisdiction and disposition hearings held June 15, 2021, Father testified regarding jurisdiction after the Department submitted on its jurisdiction report. Father testified that he dropped the child off with Mother on the day of the May 11, 2021 unsupervised visit. He did not believe Mother was under the influence and planned on picking her up at 10:00 p.m. He admitted that it was "not okay" for him to leave the child with Mother on that day, and he agreed to never let Mother have unsupervised visits if she was returned to his care. Father began his parenting and neglect classes and had not been requested to drug test.

On cross examination, Father acknowledged the prior conversations he had with different social workers about the risk of leaving the child with Mother. He was aware of Mother's substance abuse problems and longstanding history, but he claimed he was unsure about any mental health issues. Father also knew that the child's sibling was removed from Mother's care by the Department. He did not go into the home that he dropped the child off at, and he could not remember the last time he went inside the home to ensure it was safe.

Father testified that he recalled the prior advisement of the Department to only allow visits with Mother at a park with supervision when contacted in January of 2021. He had no additional information about Mother's participation in classes or her current

living situation. At the close of evidence, counsel made arguments regarding jurisdiction and whether the Department had met its burden to prove the allegations of the petition by a preponderance of evidence. The juvenile court found that the child fell within the provisions of section 300, subdivision (b) and sustained the allegations in the original petition.

The juvenile court then proceeded to disposition and heard argument from counsel. Father's counsel argued that the child should be returned to Father on a plan of family maintenance as there was not clear and convincing evidence of a substantial danger to the child. It was asserted that the risk to the child had been mitigated because Father had taken responsibility for his actions and was participating in his case plan.

The child's counsel indicated that it was supportive of family maintenance and agreed with Father's counsel that in-home supervision was appropriate. The Department's counsel argued that family maintenance was inadequate due to Father's past failures to prevent unsupervised contact between the child and Mother.

As to disposition, the juvenile court found that Father's poor judgment put the child in substantial danger and reasoned as follows:

> "I see that father had poor judgment more than just once in this particular factual situation. I think that in itself is what puts the child in danger – in substantial danger at this time. I think the father needs to go through some additional classes and so forth so he can understand the danger that he is putting the child in when he left her unsupervised with the mother."

The juvenile court proceeded to remove the child from Father's custody, ordered reunification services for both parents, and set a review hearing for December 15, 2021. Both parents were also ordered to submit to random, unannounced urine drug tests at least once per month. Father filed a timely notice of appeal on July 7, 2021.

**DISCUSSION**

## I.     Jurisdiction

Father contends the jurisdictional findings lacked substantial evidence because there was no evidence that he would ever allow Mother to care for the child without supervision in the future.  He also argues that he demonstrated remorse and took responsibility for his actions such that no current risk to the child was present at the time of the hearing.

### A.     *Legal Principles*

Section 300, subdivision (b), provides that a child comes within the jurisdiction of the juvenile court if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, …"  (§ 300, subd. (b).)

A finding under section 300, subdivision (b)(1) requires three elements:  "(1) one or more of the statutorily specified omissions in providing care for the child …; (2) causation; and (3) 'serious physical harm or illness' to the minor, or a 'substantial risk' of such harm or illness.  [Citations.]"  (*In re Joaquin C.* (2017) 15 Cal.App.5th 537, 561; *In re R.T.* (2017) 3 Cal.5th 622, 626–628.)  "Although section 300 generally requires proof the child is subject to the defined risk of harm at the time of the jurisdiction hearing [citations], the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child [citation]."  (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1215–1216.)  Thus, the juvenile court "may consider past events in deciding whether a child presently needs the court's protection.  [Citation.]"  (*Id.* at p. 1216.)

While "evidence of past conduct may be probative of current conditions, the court must determine 'whether circumstances at the time of the hearing subject the minor to the defined risk of harm.'  [Citations.]  Evidence of past conduct, without more, is insufficient to support a jurisdictional finding under section 300.  There must be some

11.

reason beyond mere speculation to believe the alleged conduct will recur. [Citation.]" (*In re James R.* (2009) 176 Cal.App.4th 129, 135–136, italics omitted, abrogated on another ground in *In re R.T.*, *supra*, 3 Cal.5th at p. 628.)

## B.     *Standard of Review*

A juvenile court's jurisdictional findings are reviewed using the substantial evidence standard of review, where we determine whether evidence of reasonable, credible and solid value supports the juvenile court's findings. We do not reweigh the evidence, nor do we consider matters of credibility. (*In re Sheila B.* (1993) 19 Cal.App.4th 187, 199–200.) " '[W]e must uphold the [trial] court's [jurisdictional] findings unless, after reviewing the entire record and resolving all conflicts in favor of the respondent and drawing all reasonable inferences in support of the judgment, we determine there is no substantial evidence to support the findings. [Citations.]' [Citation.] " (*In re J.N.* (2010) 181 Cal.App.4th 1010, 1022 (*J.N.*).)

## C.     *Analysis*

Father primarily relies on the case of *J.N.*, *supra*, 181 Cal.App.4th 1010 to support his contention that the petition was sustained without evidence of current risk and based upon a single episode of endangering conduct. In *J.N.*, the children were injured when their intoxicated parents were involved in an automobile accident. (*Id.* at p. 1014–1015.) The appellate court reversed the juvenile court's assertion of jurisdiction because there was no evidence that the parents otherwise abused or neglected their children, nor was there a finding that the parents had an ongoing substance abuse problem. In addition, the parents recognized their harmful conduct and were remorseful. (*Id.* at pp. 1022, 1026.)

Although Father was remorseful over his admitted mistakes in the present case, any meaningful comparison to the case of *J.N.* ends there. Here, the record contains substantial evidence that, at the time of the jurisdictional hearing, the child was at substantial risk of serious physical harm. As correctly stated by the juvenile court, jurisdiction in this case was not based on a single isolated incident.

12.

Father had extensive knowledge of Mother's past drug history, and he was aware of recent referrals of general neglect that were being investigated by the Department. Father admitted to previous drug use with Mother and the child lived with him on a temporary basis after the Department investigated a referral of general neglect in October of 2020. Mother admitted to the Department that she was using drugs at this time, and the referral of general neglect was substantiated. Such involvement by the Department put Father on notice that Mother was not providing a safe home for the child. This knowledge required him to take measures to ensure the child's safety when allowing Mother to visit with the child.

Instead, Father allowed the child to spend time with Mother while she was using drugs in December of 2020, and he also asked the Department for permission to allow the child to stay with Mother during that time. When Father was informed of the reports of Mother's substance abuse, he claimed that she was not currently using drugs. It is not clear in the record what this knowledge was based upon, but the juvenile court could reasonably infer that Father was supporting Mother's attempts to minimize her drug use to avoid juvenile court intervention.

Finally, Mother became upset in January of 2021 when Father stopped allowing her to take the child on unsupervised visits at the Department's urging. The Department had clearly explained the concerns of Mother's substance abuse to Father, and he acknowledged a need to seek custody of the child with a limitation of supervised visits for Mother. After Mother was assaulted in January of 2021, Father was not truthful about his knowledge of the situation, and he agreed to participate in differential response services, which involved him obtaining full custody of the child.

Although it was unclear whether Father had allowed the child to be exposed to Mother's drug use in January of 2021, it was determined that he was well aware of her substance abuse and the dangers of leaving the child with Mother without supervision. Father later testified that he was not aware of any substance abuse treatment or courses

13.

that Mother participated in from January of 2021 until the child's removal in May of 2021. However, Father informed the responding officers that he planned on leaving the child with Mother for three days during the May 11, 2021 incident.

Taken as a whole, these facts provide evidence of much more than a single episode of endangering conduct. Father continued to expose the child to Mother's drug use after contacts with the Department in October and December of 2020, and January of 2021. These three separate incidents provided Father with direct and specific knowledge that Mother was not capable of meeting the child's needs for safety and protection. The fact that Father previously stated he would not allow Mother to visit the child without supervision and failed to do so, allowed the juvenile court to make the reasonable inference that he would not follow through on his latest promise to prevent unsupervised contact between Mother and the child. By ignoring the obvious risk that Mother posed to the child, Father demonstrated that the child was still at risk of harm while in his care.

Father repeatedly contends that his remorse and insistence that he would no longer leave the child with Mother unsupervised reduces any of the Department's concerns to mere speculation. Contrary to Father's assertions, when reviewing a record for substantial evidence, as we are required to do here, we do not reweigh evidence or substitute our judgment for that of the finder of fact. (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 450–451.) The fact that Father showed remorse and promised to prevent unsupervised contact with Mother in the future does not negate the substantial evidence that actually supports the juvenile court's findings. The juvenile court was not required to accept Father's self-serving testimony nor ignore Father's past failure to deliver on such promises to prevent unsupervised contact.

Furthermore, the lack of any actual harm being inflicted on the child is irrelevant as subdivision (b)(1) only requires a "substantial risk" that the child will be harmed. Father knowingly exposed the child to such a risk when he left the child in Mother's care, and there was ample reason to doubt Father's claim that it would not happen again. The

14.

evidence of Mother's repeated admissions of drug use in the months preceding removal established a problem of substance abuse that remained untreated through the date of the child's removal.

We conclude, based on Father's prior conduct and admitted knowledge of Mother's inability to care for the child, that there is substantial evidence to support the juvenile court's jurisdictional finding.

## II.     Removal Order

Father also argues that the juvenile court's order removing the child from his care is not supported by substantial evidence because the removal was in response to a one-time incident and there were several alternatives to removal available.[2]

### A.     *Legal Principles*

To remove children from a parent's custody, the juvenile court must find by clear and convincing evidence that (1) there is a substantial danger to the child's physical health, safety, protection, or physical or emotional well-being if the child is returned home, and (2) there is no reasonable means by which the child can be protected without removal.  (§ 361, subd. (c)(1).)  The jurisdictional findings are prima facie evidence that the child cannot safely remain in the home.  (*Ibid.*)

"The juvenile court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accordance with this discretion.  [Citations.]"  (*In re Jose M.* (1988) 206 Cal.App.3d 1098, 1103–1104.)  "In determining whether a child may be safely maintained in the parent's physical custody, the juvenile court may consider the parent's past conduct and current circumstances, and

---

[2] According to a minute order from the December 15, 2021 six-month review hearing, the juvenile court returned the child to Father on a plan of family maintenance. The Department attached the minute order to its motion to dismiss the present appeal, which we denied on December 28, 2021.

15.

the parent's response to the conditions that gave rise to juvenile court intervention. [Citation.]" (*In re D.B.* (2018) 26 Cal.App.5th 320, 332.)

"A removal order is proper if based on proof of parental inability to provide proper care for the child and proof of a potential detriment to the child if he or she remains with the parent. [Citation.] 'The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child.' [Citation.]" (*In re N.M.* (2011) 197 Cal.App.4th 159, 169– 170.)

## B.     *Standard of Review*

We review a juvenile court's dispositional findings under the substantial evidence test, bearing in mind that clear and convincing evidence requires a heightened burden of proof. (*In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1654.) Father bears the burden of showing there is no evidence of a sufficiently substantial nature to support the removal order. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

## C.     *Analysis*

To support his challenge to the removal order, Father relies on the case of *In re A.E.* (2014) 228 Cal.App.4th 820, where the court reversed an order removing a child from her father's custody after he spanked her with a belt on a single occasion. (*Id.* at p. 822.) The appellate court found that it was "clear that this was an isolated incident that was unlikely to recur." (*Id.* at p. 826.) Moreover, the mother affirmed that she would not allow the father to strike the child with a belt, and the department credited the family for being "cooperative, motivated to solve problems, willing to accept service from [the department], and willing to change." (*Id.* at p. 827.) In the present case, unlike in *A.E.*, it is not clear that Father's conduct involved an isolated incident.

Here, Father posed a substantial danger to the child's safety because, although he knew of Mother's long history and recent drug use, he failed to take proper measures to protect the child from the risk posed by Mother's inability to provide proper care. The

juvenile court found that the child should be removed from Father based on him allowing the child to be with Mother without supervision given Father's knowledge of Mother's unresolved substance abuse issues. Father had already been provided a chance to avoid juvenile court intervention after prior contacts where he promised to seek full custody of the child. Despite such a promise, Father did not follow through until law enforcement became involved in the days leading up to the child's removal.

By the time of the dispositional hearing, Father had already been provided multiple chances to seek full custody of the child and limit Mother's visits to supervised through formal custody orders. His continued failure to seek full custody and his willful exposure of the child to the risks that Mother posed with an unresolved substance abuse problem, each provided substantial evidence to support the juvenile court's removal order. Father's claim that this was a one-time mistake and simple lapse in judgment mischaracterizes the actual events leading up to the child's removal. The Department's reports documented the numerous efforts that were undertaken to avoid juvenile court intervention and provide Father with the necessary tools to protect the child from Mother's conduct. The string of referrals preceding the child's removal comprised much more than a "one-time" incident.

It is also asserted that the juvenile court misstated the law and evidence when it stated that it did not have enough "to say that father's not gonna make that judgment again." It is evident from the context of the juvenile court's statement that it did not believe Father was able to rebut the evidence provided by the Department that he would not be protective of the child in the future. There is no suggestion that it believed Father had to prove the absence of a substantial danger, and the juvenile court made the affirmative finding by clear and convincing evidence that there was a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the child.

The juvenile court's refusal to accept Father's contention that this was a one-time incident of poor judgment is well supported by the record. Beginning in October of 2020, the child was found to be living in hazardous and unsanitary conditions in Mother's home and Mother admitted to drug use. This led to an arrangement where the child would live with Father on a temporary basis. Only two months later, it was reported that Mother was still using drugs and the child was with Mother "some of the time." The child was present at Mother's home during the December 23, 2020 referral, and it was reported that the child was sitting near drug paraphernalia. While the Department's investigation of this referral was still ongoing, Father asked the social worker if he could let the child stay with Mother despite his knowledge of the reports of drug use.

Contrary to Father's repeated characterization that this was a "one-time" incident, Father's poor judgment dates to at least December 23, 2020. During that time Father either knew or should have known that Mother had an unaddressed substance abuse problem. However, he allowed the child to return to Mother's home where she was exposed to the Mother's drug use. With all of his knowledge of the Department's prior contacts and insistence that he obtain sole custody of the child, Father could not reasonably bury his head in the sand each time he allowed the child to return to Mother's care. Father's continued willingness to allow the child to return to Mother's care provided the juvenile court with ample reason to proceed with caution before returning the child to his care.

Finally, we are not persuaded by Father's contention that reasonable means existed to prevent the child's removal, such as a court order prohibiting unsupervised contact between Mother and child, unannounced visits at Father's home, and daily phone contacts with the Department to account for the child's whereabouts. While Father made a renewed promise to not allow unsupervised contact between the child and Mother, under any of these scenarios, nothing actually prevents Father from leaving the child in

18.

Mother's care. There was no way to ensure the child's safety except by removing the child from Father's care short of around the clock supervision of Father.

Although Father was remorseful and beginning to participate in services, the juvenile court could reasonably conclude that the child was at substantial danger if returned to the Father's care until he was able to participate in services and demonstrate an actual ability to ensure the child's safety, and the only option to protect the child was removal from Father's custody. Accordingly, substantial evidence supports the juvenile court's finding that there was a substantial danger to the health, safety, or well-being of the child and no reasonable means of protecting her without removing her from Father's custody. (§ 361, subd. (c)(1).)

## III. Case Plan Requirements

Father's final contention is that the juvenile court abused its discretion by ordering him to submit to monthly random drug tests, refrain from the use of alcohol, and participate in substance abuse counseling after a positive drug test. He argues that we should reach the merits of his claim despite the lack of any objection to the case plan requirements below. We conclude, however, that father forfeited his claim of error by failing to object to the orders related to alcohol and drug testing, and even if not forfeited, the claim fails on the merits.

### A. *Legal Principles*

" 'A party forfeits the right to claim error as grounds for reversal on appeal when he or she fails to raise the objection in the trial court. [Citations.] Forfeiture … applies in juvenile dependency litigation and is intended to prevent a party from standing by silently until the conclusion of the proceedings.' [Citation.]" (*In re N.O.* (2019) 31 Cal.App.5th 899, 935; see *In re S.B.* (2004) 32 Cal.4th 1287, 1293.) "A party may not assert theories on appeal which were not raised in the trial court. [Citation.]" (*In re C.M.* (2017) 15 Cal.App.5th 376, 385.) The "failure to object to a disposition order on a specific ground

generally forfeits a parent's right to pursue that issue on appeal. [Citations.]" (*In re Anthony Q.* (2016) 5 Cal.App.5th 336, 345.)

When fashioning a dispositional order, the juvenile court may make "all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the child." (§ 362, subd. (a).) The court also may "direct any reasonable orders to the parents or guardians of the child who is the subject of any proceedings under this chapter as the court deems necessary and proper to carry out this section." (*Id.*, subd. (d).) A juvenile court acts within its discretion when its orders are reasonably tailored to advance a child's best interests. (*In re Natalie A.* (2015) 243 Cal.App.4th 178, 187.)

"At disposition, the juvenile court is not limited to the content of the sustained petition when it considers what dispositional orders would be in the best interests of the children. [Citations.] Instead, the court may consider the evidence as a whole." (*In re Briana V.* (2015) 236 Cal.App.4th 297, 311.) The juvenile court may "formulate disposition orders to address parental deficiencies when necessary to protect and promote the child's welfare, even when that parental conduct did not give rise to the dependency proceedings. [Citation.]" (*In re K.T.* (2020) 49 Cal.App.5th 20, 25.)

**B.     *Standard of Review***

The " 'juvenile court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accordance with this discretion. [Citations.] The court's determination in this regard will not be reversed absent a clear abuse of discretion.' [Citation.]" (*In re Corrine W.* (2009) 45 Cal.4th 522, 532.) In reviewing an order for abuse of discretion, we " 'must consider all the evidence, draw all reasonable inferences, and resolve all evidentiary conflicts, in a light most favorable to the trial court's ruling. [Citation.] The precise test is whether any rational trier of fact could conclude that the trial court order advanced the best interests of the child.' " (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067.) "The trial court is

20.

accorded wide discretion and its determination will not be disturbed on appeal absent 'a manifest showing of abuse.' [Citation.]" (*Ibid*.)

## C.    *Analysis*

In this case, Father never objected to the portion of the disposition orders that required Father to comply with certain components of his case plan related to substance abuse.  Father does not dispute this fact on appeal.  Instead, he claims that such an objection was not required or that his trial counsel's failure to object constitutes ineffective assistance of counsel.  Although we have discretion to excuse forfeiture, this discretion "should be exercised rarely and only in cases presenting an important legal issue.  [Citations.]" (*In re S.B.*, *supra*, 32 Cal.4th at p. 1293.)  We find that Father forfeited any claims related to the requirements of his case plan that were ordered at disposition, and there is no showing that this claim involves an important legal issue or ineffective assistance by trial counsel.

In any event, even if Father had not forfeited the above-referenced claims on appeal, we find Father's claim lacks merit.  The juvenile court ordered Father to participate in parenting and neglect counseling, random drug testing on a monthly basis, and abstain from the use of alcohol.  Father was not required to enroll in substance abuse counseling unless he failed to appear for a test or tested positive for drugs or alcohol.  Although the juvenile court did not make any jurisdictional findings based on current drug use by Father, the court acted within the bounds of reason when it ordered Father to submit to drug testing just once per month.

Father admitted to past use of methamphetamine with Mother, and he had a prior conviction for possession of a controlled substance in September of 2015.  The child had already been subjected to the negative effects of drugs in her home environment at her very young age, and the juvenile court's obligation to protect the child from the negative effects of drug or alcohol use by a parent is reasonably related to the challenged orders.  On this record, the juvenile court reasonably concluded that monthly drug testing and a

21.

period of no alcohol use were necessary to eliminate the conditions that led to the child's dependency status.  (See § 362, subd. (d).)  We find no abuse of discretion.

## DISPOSITION

The juvenile court's orders are affirmed.


POOCHIGIAN, ACTING P. J.

WE CONCUR:


DETJEN, J.


SNAUFFER, J.